Good morning again. Joining me this morning on the panel is Judge Floyd and Judge Rushing. I welcome you all to the Fourth Circuit. We have two cases for hearing this morning, and we'll begin with 17-4696, United States v. Khweis. I hope I'm pronouncing that correctly. If not, Mr. Beal, you'll correct me, and we are pleased to hear from you, Mr. Beal, whenever you're ready. Thank you, Judge. May it please the Court and counsel, the government's argument starts by contending that Mashburn resolves the defendant's suppression claim. In their brief, they state the first question is whether the two-step interrogation technique was used in a calculated way to undermine the Miranda warnings, and the district court found, as a matter of fact, that it was not, and then they contend the defendant did not challenge this. In fact, we did challenge that, and before I explain why, I would note that we believe that the district court's finding was a conclusion of law and not a finding of fact. But more than that, the defendant's opening brief states that Mashburn, the brief states that Mashburn states that Justice Kennedy believed that the admissibility of post-warning statements should continue to be governed by the principles of Elfstead unless the deliberate two-step strategy was employed, in which case curative measures must be taken. And I would note that in his opinion. And we then, in our opening brief, say in this case, the use of a two-step process was clearly deliberate. We challenge that, and in the reply brief we state, in this case, in the 11 initial interrogation sessions, Miranda warnings were consciously and deliberately not given. And indeed, they were deliberately not given, and Agent Connolly explained why in his testimony. He testified that their concern was that if the Miranda rights were given before the initial questioning, Mr. Quyce wouldn't talk to them. And so they didn't give them, and that constitutes deliberate undermining of Miranda. So moving on from that first point, Justice Kennedy's concurrent state, the fact that stated that when an interrogator uses this deliberate two-step strategy predicated upon violating Miranda during an extended interview, post-warning statements that are related to the substance of the pre-warning statements must be excluded, absent specific curative steps, must be excluded. And so the great puzzle in this case is why, as we see it, the government did not take any of the curative steps that Justice Kennedy identified to be taken. These were not... Mr. Beal, can I... I'm sorry, this is Judge Diaz. You used the phrase specified curative steps. Is it your position that a government agent must take specific... there's no leeway in terms of the options available with respect to curative steps, or is it lock, stock, and barrel? You have to follow a certain number of steps, and if so, which ones are they? Well, the three steps, a change in time or place or informing the defendant that his prior statements can't be used, those are acceptable steps. I'm not saying that nothing else could be used, but certainly the smart thing to do is to use one of the steps that he lays out for you. But I'm not contending that under no circumstances could anything else be used. So where do you say the government fell short here? Well, there are two things. One is where Mr. Quyce ended up, which I'll get to in a minute, but that they didn't use... the second interrogation took place down the hall from the first interrogation and we contend there was no meaningful break in time. The break in time between the first and second set of interrogations were almost the same as between two of the interrogations in the first session, and Mr. Quyce was not told that his statements in the first interrogation couldn't be used in court. So the three steps identified by Justice Kennedy were not taken and we don't think that any sufficient alternative was used either. Well, there was a break in time of a number of days, I think ten days. Are you saying that that isn't enough or that on the facts of this case it isn't enough? Well, with the facts of this case, because there had been a break within the first set that was almost the same, and we also suggested, and I think it's true, that there was interrogation going on by the Kurds at the same time without the agents present, and we think one of those interrogations took place during that interim period, but the main point is there was not a meaningful difference between the breaks within the first set of interrogations and between the first and second set. Mr. Beal, this is Judge Floyd. Does it make a difference that the interrogation occurred in the same facility? In other words, if he had been taken to another location other than the facility where he was, would that make any difference? Yeah, if it signaled to him, hey, this is something different, I mean, that's I think what Justice Kennedy is getting at. This was down the hall. There was no difference. Essentially, the second interrogations were a continuation of the first interrogations. There was nothing signaling to Mr. Quyce that it was different in any way, shape, or form. Mr. Beal, this is Judge Rushing. What about the fact that the second group of interrogators specifically told Mr. Quyce that they didn't know anything he had said to the earlier interrogator? They didn't know what, if anything, he had said. They didn't know if he had talked and if he had talked, what he said. That seems to me maybe even a bigger difference than a different room or a different building. Well, except that what then happened is they asked him essentially the same questions as in the last session of the first round. It was basically a repetition. The first round had essentially been a rehearsal as a practical matter, and he was being asked the same questions that he had been asked before and was given the same answers he'd given at the end. So to him, it looked like essentially a repetition of the same interrogation. Are you saying that the interrogators offered, here's what you said previously, or just that they asked the open-ended question and he gave the same answer? The latter. Mr. Beal, could you tell me what happened to the attorney that Mr. Quyce's parents hired? You may recall there was an understandable delay in that because the initial form he signed didn't authorize the State Department until late in the game to inform both the attorney and Mr. Quyce. They did not meet until after he was back in the United States. They did not have any communication while he was in Iraq, to my knowledge. And so getting to the situation from Mr. Quyce's perspective as opposed to the agent's perspective, at the point in time when he was given the first and only set of Miranda warnings, his focus was on returning to the United States and not having to serve an extended sentence in an Iraqi or Kurdish prison. He had experienced the conditions in those facilities, sweeping on a concrete floor with only a blanket and no mattress, having to pee into a bottle, being far removed from his family, knowing he had far fewer rights in that system. With the result, he actually cried during some of the initial interrogation sessions because of the fear he might not be going back to the United States unless, and Agent Connolly had told him, that you have to give us the information so that a criminal complaint can be filed against you, otherwise you won't be going back to the United States. So the idea that Mr. Quyce was making a free and rational choice in answering the second set of questions really is not realistic for several reasons. One is the cat was already out of the bag and he knew he couldn't retract what he'd already stated. He was obsessed about returning to the United States. He was oblivious to his future rights in the American legal system compared to his fervent desire to get to the American legal system. Mr. Beale, can I ask a question about that? Do we look at the suspect's particular circumstances? Is it a subjective test or is it simply what a reasonable individual would prefer? Well, it would be what a reasonable person in all of Mr. Quyce's circumstances go, in being a reasonable person being interrogated in a Kurdish prison with all the conditions there and with a desire to get back to the United States. How would that kind of a person perceive his situation and how would that affect his perception of the Miranda rights? That's on top of what a reasonable person perceives the second round of questions as simply being an extension of the first round as opposed to something new. I would submit that under all the facts and circumstances of this case, not only did Mr. Quyce perceive it that way, but that's what a reasonable person would have perceived. Can I ask, Mr. Beale, to back up to the first part of this analysis, and that is, and I don't blame you for this, you're indicating to us that we should apply this deliberate and purposeful lens to what was going on here, but of course there's this other analysis, whether or not that Agent Connolly was engaged in a legitimate objective of gathering intelligence, and I think that's where the district court hung its hat on. So I'd like you to talk about that. Why isn't the fact that this was a separate intelligence gathering operation sort of answer the question here and suggest that there was no violation as a result? We're not contesting that they had legitimate intelligence gathering, but that doesn't obviate the need to follow the law in Siebert, which they knew about. There was absolutely no reason they couldn't have given the curative steps. We're not attributing an evil intent to the Agent Connolly, but we are attributing to him a violation of Miranda. You can violate Miranda without having an evil intent. Miranda is a bedrock of American law, and you've got like the Cowper's case in the Second Circuit where they talk about rookie mistakes and inadvertence. This was intentional. This was not inadvertent. Agent Connolly said in his testimony he recognized that they were jeopardizing the admissibility of this, yet they didn't follow the dictates of Siebert, which since Agent Connolly, he was consulting with the general counsel of the FBI in Washington. That's in the record. He was consulting with his supervisor in Baghdad. The two new agents came out from Washington, in that they inexplicably from my point of view, didn't do the things that they could have done to alert Mr. Kweiss to this being a wholly new undertaking. Siebert is quite clear that that violation must be excluded. That's the language of Siebert and Justice Kennedy's concurrence. Mr. Beale, does it make any difference that both teams, the intelligence gathering in the first instance and the criminal part of it, does it make any difference that all the people involved were from the FBI? That makes it, from Mr. Kweiss' point of view, make it look like there was no change. That supports our perspective on this, that it was one continuous process, at least from the point of view of someone in Mr. Kweiss' position. The contrast is with what happened a month later when he's on the plane back to the United States. There are a small number of statements that were made. There we have a break in time of more than a month. He's in an airplane, not in an Iraqi prison. You have a dramatic change in circumstance, but not within the two sets of questioning in the Iraqi detention center. Mr. Beale, this is Judge Diaz. You're a little bit over your time. If you have a final concluding statement, otherwise you have reserved some time for rebuttal. Sure. I would just say that in this case, the requirements of Siebert have simply not been met. Defending Kweiss calls upon the court to reverse the denial of the motion to suppress and remand the case to the district court for a new trial. On the other issues, I will rely on my brief. Thank you, Mr. Beale. Mr. Young? Good morning, Your Honors. May it please the court. When in March 2016, the defendant surrendered to Peshmerga soldiers in Iraq, the FBI realized that an American had gotten from his home in Virginia to ISIS-controlled territory without anyone from the United States detecting his movement. That raised several urgent national security questions. Did that person get recruited in the United States? Who facilitated his travel to Turkey, to Syria? And were there other Americans in that exact same pipeline? That factual backdrop led to the decisions that give rise to this appeal. The FBI made the decision to conduct intelligence-gathering interviews without Miranda warnings, followed by law enforcement interviews with Miranda warnings. The district court concluded that the defendant's conditions of confinement were not coercive and that those warnings were effective. Because those conclusions were correct, the motion to suppress was properly denied and this court should affirm. I'd like to start, Your Honor, with the main point we open with in our brief, which is we don't think this is a case that implicates the need for curative measures at all. That's for three reasons. First, we think the objective evidence supports the conclusion that there was no deliberate attempt to undermine Miranda. Second, we think the subjective evidence supports that conclusion. And third, we think on these facts, the defendant's argument to the contrary is fairly weak. So let me start with the objective evidence. And I'll begin where my friend on the other side began with this court's decision in Mashburn. And let me be very clear about what is new and not new under this circuit's doctrine. My friend is entirely correct when he says that Mashburn is a case involving what could be characterized as a good faith mistake. And there are lots of circuit court cases like that. But Mashburn also says at page 307 that the tactic that Siebert prevents is treating the second interview session like a cross-examination. That is the evil that the Supreme Court was getting at. And that evil is completely absent here. The best discussion we've seen of this is the Second Circuit's decision in Moore, because there the Second Circuit said, if you were to apply the factors from the plurality opinion in Siebert that would go to whether the Miranda warnings were effective, those same factors bear on whether there was a plot to undermine Miranda at all. Because, of course, if the government has gone to all the trouble to create all of this separation between the round one interviews and the round two interviews, that supports the conclusion that there was never an attempt to try to undermine Miranda in the first place. My friend a moment ago said he agrees that there was no evil intent here. We think that's more or less dispositive. In a case called Reinhart, which is the Third Circuit's decision, Judge Becker uses the phrase nefarious plot. In the absence of a nefarious plot... Mr. Young, could I ask you about... I'm sorry, Judge Diaz here. So whether or not there was evil intent or improper motive, one of the things that troubles me about this case is the emails from Agent Connolly that all but suggest that in addition to gathering intelligence, he is in fact sort of preparing or prepping, serving on a platter, for lack of a better phrase, for what was to follow. So it seems to me that he was operating, Agent Connolly, was operating under two purposes. One, both legitimate, the first legitimate intelligence gathering operation. But secondly, sort of setting the stage for what was to follow in terms of the domestic investigation. And I find that troubling. You don't? I have several responses, Judge Diaz, and I appreciate the Court's concerns. The first response is there was a multi-day suppression hearing in which Agent Connolly testified for hours. And the key transcript pages are 516 through 530, where he is confronted with every one of the electronic communications that Your Honor discusses. And he provides an explanation for what was happening in his mind. He said that he was not trying to tee up a criminal concussion. Why do we need to sort of figure out what was going on in his mind? Don't the emails speak for themselves? I disagree, Your Honor. I think that this Court's doctrines say that district courts are making credibility determinations in suppression hearings. This district court judge watched Agent Connolly explain himself at great length and concluded that what was happening in those communications was braggadocio, and it did not reflect an intent to tee up a criminal concussion. And I'd like to make two points about that that I think go directly to my friend's argument. Here's the first. If the record showed that there was no legitimate intelligence gathering purpose and that the fifth, sixth, seventh interview were just rehearsals, that he was just being asked the same questions again and again to no end, then I think it would be a fair inference that something improper was happening. But that's just flatly contrary to the record. Agent Connolly testified that on three separate occasions, March 19th, 26th, and April 7th, and April 7th is the 10th of the 11 interviews, the defendant himself volunteered at the beginning by saying, I have to be honest with you, I've been lying. I have not been giving you the full story. So this is not a case where he's being sort of run through the ringer in order to soften him up for step two. His story is changing at every step of the way, and we think that matters a great deal. The second thing I would say, Judge Diaz, is there are suggestions here and there in my friend's brief that Agent Connolly's statements in his electronic communications about, for example, truthfulness, getting this defendant to be truthful, speak to this desire to soften him up for a criminal confession. Respectfully, we disagree. At JA 464, Agent Connolly testified that the reason that truthfulness is so critical in these national security interviews is that this information is shared with American allies, and those allies can engage in raids, wire raids, and so on. So back to the point you made earlier about the number of interviews, so it's your position that those interviews weren't repetitive in some way? I'm sure there was some repetition involved in the questioning, but are you saying that at every step some new information was being garnered and that's why the interviews continued? Yes, I am. I agree with Your Honor completely. There had to have been some overlap, but Agent Connolly was walked through each of these, and if the court reviews the suppression hearing transcript, he is asked, is there new information here? Is this still valuable intelligence? And he says, yes, all the way through. In fact, I believe his testimony is that he thought there would have been more new intelligence information that could have been gathered, but a decision was made to stop around April 10th. So again, if the record showed that he was just being run through the ringer again and again to no end, totally different case. But we just don't think that that's what this record shows. Can I ask about the backdrop, and Judge Floyd touched on this, same facility, no change in facility. There was obviously a change in the interrogators and a number of different things that they told them about what their purpose was, but overlaying all of this was overriding concern to get the heck out of Iraq as soon as he could. As I think your friend put it, at one point he was crying, he was terrified, he just wanted to get back to the United States. And Agent Connolly, the record seems to suggest, sort of fed into that by suggesting to him that the easiest path to getting back to the United States was to cooperate. So what are we to do about that? I have two answers, Your Honor. The first is with respect to wanting to get out of Iraq. I think the district court judge got this exactly right by citing the Supreme Court's decision in Colorado against Connolly. Miranda is not implicated absent state action. So anything that the defendant brings to the table does not in and of itself show coercion. There has to be something more. So as the district court concluded, we think correctly, this defendant chose to go to Turkey and then Syria. This defendant chose to travel with ISIS from Raqqa to Mosul to Tal Afar and then to surrender to the Peshmerga. So in our view, that does not factor into the Miranda analysis. That's just the table setting. Now, whether or not coercive things happen later is absolutely relevant to the totality analysis. But again, there was a multi-day suppression hearing, and there was no testimony that this defendant was abused by his Kurdish jailers, that he was terrified. He was visited four times by consular officials, 11 times by Agent Connolly, and four times by the FBI. And at no point did he complain about coercive conditions of confinement or being frightened of his jailers. So against that backdrop, we don't think the argument that, well, he was a 26-year-old kid and he wanted to get home, carries much weight. On the specifics of the... Yes, Your Honor. Why did you just differentiate Connolly? You said Agent Connolly and then by the FBI. Aren't they all the FBI? I think they are all the FBI, Your Honor. But I think, and perhaps this goes back to Your Honor's question to my friend on the other side. I think once Agent Zinkala and Martinez in the law enforcement interviews tell the defendant, we do not know anything you said in the prior sessions. And even if you spoke previously, you have absolutely no obligation to speak to us. That solves the, it's all the FBI problem. If they had been mistruthful or lied about that, that would bear directly on whether the Miranda waiver was knowing or voluntary, but of course they didn't. Judge Diaz, I wanted to go back to your point about confessions, because I think it's very important. Agent Connolly testified that there's a radical difference between an intelligence interview and a law enforcement interview trying to get a confession. And the difference is, he said, that in a law enforcement interview, you have the elements of the federal crime. And all you're trying to do is get the defendant to say that he personally committed each one of those elements. And so this goes back to, you know, a different case. If the record showed that in addition to saying what he said, Agent Connolly had, for example, told this defendant, oh, and by the way, here are the elements of a material support charge, just so you can be thinking about it for the next month. Different case. Because there might be an argument there that what was happening was pressure to get the defendant to fit his statements into the box that would create a viable confession. But of course, that didn't happen at all. All Agent Connolly said was whether or not this defendant was going to return to American custody depended on the assessment of others about whether a crime had been committed, which was entirely true. And Mashburn says, if all the agents are saying is something that's true, in Mashburn it was, you can help yourself by cooperating. That's not coercive, and we think that's right. I want to talk for a few moments about the shape of the doctrine here. We cite any number of cases in the brief, Jackson, which is a First Circuit decision, Thomas, an Eighth Circuit decision, and Moore, which I've discussed a moment ago, about how if there is a bona fide alternative purpose that is not to soften up the defendant for the second round interviews, Justice Kennedy's concurrence in Siebert just isn't implicated at all. Both Jackson and Moore were about guns. The police were trying to find ditched guns from crimes, and they asked questions of a potential target about where are the guns. And both of those courts said that's not an attempt to undermine Miranda. And then Thomas was a murder case where it became clear that what was happening is the defendant was trying to tell police that he had committed this awful crime, but because police didn't know what had happened, they asked more questions to try to establish probable cause. And what the Eighth Circuit said there is probable cause is not undermining Miranda. And so here, where the AUSA for the government cited the Hague opinion from the Supreme Court in arguing this below, the Supreme Court has said there is no compelling interest for the national security. And of course, all of this is happening against the backdrop of the burning alive of the Jordanian pilot had already occurred. The Paris attacks that resulted in 130 deaths had already occurred. I mean, these national security concerns were pressing and urgent. And we think given the district court's factual findings, Judge Diaz, I take your point about the electronic communications. But of course, on clear error review, the court has to be left with the firm conviction that a mistake has been made. Given how much he testified and how much he was subject to cross-examination, and just entirely reasonable explanations for what was happening, we do not think that clear error has been shown. I'd also like to talk for a few moments, if I could, about two additional issues. One is, let's say the court doesn't want to reach that first argument and just wants to go to Seabrook. Counsel, can I, before you move on, can I, I'm not sure if you're changing topics completely, but I had a factual question about the curative measures. Was there any evidence at the hearing or in the record about whether there was another facility that Mr. Kweiss could have been transported to? I know your argument is there were many curative measures, including, you know, a different room in the same building. I was wondering whether there was another secure building that he could have been taken to, or if there's no evidence in the record about that either way. Here's what I would say, Your Honor, and I'm interpolating a little bit, but I think it's fair. Of course, there was a claim in the district court that the Kurdish forces and the Americans had an improper relationship, and the district court rejected that claim, and it's not here. But the reason I start with that point is there was a lot of factual testimony at the suppression hearing that this defendant was in Kurdish custody full stop. I mean, he was not in American custody until June 8th. There was also statements at the suppression hearing, and I confess, Your Honor, I'm not sure if this is on the record or if this is in colloquies with the district court judge, but it's in the transcript. As I recall the testimony, the facility in Erbil was kind of a compound with a courtyard, and there was another prison nearby that wasn't solely dedicated to the Kurds. I think that's the only information in the record, but to that, Your Honor, I would say, I mean, then we're hypothesizing a scenario where he's transported from one Kurdish facility to another Kurdish facility. I don't think there's anything in the record suggesting the Kurds would have given him to the Americans to interrogate in an American facility. That's what kind of I wondered about was that he was in Kurdish custody, and it wasn't clear to me from the facts on the record whether he could have been moved, but that's one suggestion that Justice Kennedy has made. Another suggestion is telling the defendant that what they previously said can't be used in court, and you may have mentioned this in your brief, but I think that's been criticized as maybe not entirely accurate. Would that have been, in your opinion, would that have been more accurate given the conditions of his previous conversation? Judge Rushing, I think if either Agent Sokala or Martinez had made that statement, it would have created enormous litigation risk, and it's a great question, and I want to explain why. You know, we think Justice O'Connor got this exactly right in Elstat. It's very dangerous to turn an FBI agent into a lawyer, and this case is a perfect example because this case implicates at right? So there's Harris. Even suppressed statements can be used to impeach, and this defendant testified. So unbeknownst to the agents at the time, months later at trial, it might have been important or proper to use those statements. That's doctrine one. Doctrine two is this is a case that implicates Patain because, of course, we make a harmless error argument on the view that all of the electronic evidence comes in irrespective of the statements because the Supreme Court has been very clear that as long as the statements were in irrespective of the evidence, there was no harm. So this is a doctrine problem, and, of course, neither Agent Sokala or Martinez would have been in a position to testify about that. And the third doctrine that's implicated is Tucker, which is about finding witnesses based on suppressed statements. I mean, the evidence showed that this defendant reached out on social media to two Twitter handles, Islam is Peace and someone with the moniker, the Mad Mullah, and made statements that were inculpatory. Imagine the government had found the Mad Mullah and tried to put him on the stand about his communications with the defendant. Now, all of a sudden, the FBI agents in the round two interrogations have suggested something that in several different respects might not actually be true. And so our view on this, Your Honor, is in some ways, would we have an easier job today if the statement had been made, the first round statements probably can't be used against you? Possibly. But it would have created enormous litigation risk for the trial team about misleading this defendant in exactly the way that Justice O'Connor describes in Elstad. Why did you raise the public safety exception to Miranda? So, Your Honor, in our brief, we say... The reason I ask that is you use the word terrorist. So, why use that word and then not raise the public safety exception? Because the government was being conservative, Your Honor. If this were a Quarles case, we would have tried to introduce the intelligence gathering statements, right? Because those were the interviews that were conducted for public safety reasons without Miranda warnings. But at no point did the government try to introduce those first round statements under Quarles. I think what's happening here is like a Quarles cousin. In the Moore case from the Second Circuit, where the police are trying to recover a gun that was ditched during a violent crime, the Second Circuit says, obviously, there are public safety implications to recovering a firearm that are not the same thing as undermining Miranda. We think that's of the second warrant statements. So, the answer to your question, Your Honor, is we were being more cautious than that. That's why. If there are no further questions from the court, then I will end where we ended the brief. This case raised depressing and compelling national security concerns. And the government's submission to this panel is that it acted carefully and thoughtfully and at great length to protect this defendant's Miranda rights. And for that reason, we ask the court to affirm the convictions on counts one and two and remand for a resentencing. Thank you, Mr. Young. Mr. Beal, you've got some rebuttal time. Yes, I just have a couple of brief comments. The first is that there was this observation that the district judge said that it didn't constitute a cross-examination. On the other hand, I think it's pretty clear it did constitute a rehearsal. The rehearsal was not the only reason that the questioning was done. But when they sent the emails back to Washington saying that he's ready for the clean team, that's essentially an acknowledgement that there's been a rehearsal involved here, even if that's not the only thing that was going on. And the second thing is that in terms of Mr. Quyce talking to Connolly about a criminal prosecution, Connolly repeatedly told him that it's not our decision. That's a decision made essentially in Washington. But the information on which that decision is based is the information that went through Agent Connolly. So he was basically letting Mr. Quyce know that Mr. Quyce needed to cooperate with him to get back home because he was the one that was sending the information on to Washington that the decision would be based on as to whether a complaint was filed and Mr. Quyce could come back. So in terms of the larger picture, our position is simply that this is a situation where the government knowingly did not give the Miranda warnings. They knew what they needed to do in terms of curative measures and inexplicably did not utilize those. And therefore, we submit that the CBRT requires that the confession be suppressed and we ask the court to rule that the confession was improperly admitted and to remand the case to the district court for a new trial. Thank you. Mr. Beal, thank you. Can I ask a question in response to an answer Mr. Young gave to Judge Rushing's question about advising the defendant as to the possible consequences of his earlier statements? Mr. Young spent a good bit of time explaining why that was a risky proposition. Obviously, we have the statement from Justice Kennedy and his opinion, but what is your response to that? It seemed to make some sense to me that it's hard to predict admissibility and they'd be walking a tightrope at best trying to figure out whether or not these statements could be used for some purpose. Well, my response to that is, first of all, that's one of the curative measures that's provided for. But secondly, that when they intentionally did not give the Miranda warnings, Agent Connolly not only was in a position to, but did consult with multiple lawyers in the Justice Department, and they could have crafted a statement to the defendant that they were comfortable with, which did not unduly jeopardize the future of a criminal prosecution, but met the requirements of CBRT. And they simply didn't do that. So that was an opportunity they should have taken advantage of once they decided not to give Miranda rights to take the steps that were required of them, and they chose not to do so. Out of curiosity, and this is maybe unfair to ask you to craft on the fly, I think it might be hard to do, but what would that instruction say that what you previously said can't be used against you except what? Well, the except is the hard part, and I'd have to sort of sit down with a Fourth Amendment handbook and figure out how the except part... I mean, since the Miranda warnings were not given, they basically couldn't be used. And then what they would simply have needed to do is to craft an exception so they weren't saying something that would cause a problem for them later. I don't see that that's an insurmountable sort of drafting of a statement problem. I mean, that's what lawyers do. I can't do it on the fly here, but they had plenty of resources and could readily have done that. And what's the, aside from that statement, what's the other curative measures that they should have taken but didn't? Or that if they had taken them, you would say no problem here? Well, they could have had a greater break in time. He didn't leave Iraq for a considerable additional period of time. They had a problem getting visas for the pilots for the plane that left and so on. So they could have created a longer break than between the interrogation sessions within the first round. And as far as... I thought there was some evidence about the timing being an issue because the Kurds were going to prosecute him themselves. Am I remembering that correctly? Yeah, that's right. There was a concern about that, but nevertheless, there was still a very substantial delay, in fact, happened and the Kurds continued to be cooperative. So having more time, even if not a lot more time, between the first and second than within the first would have been feasible. And as far as a different facility, they didn't even try as far as I know. The record certainly doesn't suggest that. And I think there's a reasonable chance that not... They were three interrogation sessions by the clean team. And I think it's not unreasonable to think at least they could have asked to have one or two of those take place somewhere else to make it obvious that this was a new, a different undertaking. And they didn't even try to do that as far as I know. All right. Thank you. Thank you, Mr. Beale. I want to thank both you and Mr. Young for your very able arguments. And Mr. Beale in particular, I want to thank you for... Because my docket sheet reflects that you were court appointed and we obviously could not do the important work that we do without lawyers such as yourself being willing to take on these cases and as you did here today, very ably representing your client. So on behalf of the court and my colleagues, thank you very much for undertaking that assignment. You're very welcome. We would typically come down after the argument and shake your hands. Obviously, we can't do that except perhaps virtually. But understand and know that we very much appreciate your work before the court. And thank you for allowing us to... For providing such able assistance in helping us to do our work here today. So stay well, be safe. And the court will stand in a short recess until we prepare our next case. Thank you very much. Okay. This audible court will take a brief recess.
judges: Albert Diaz, Henry F. Floyd, Allison J. Rushing